UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DEON COLVIN, ) | |
| ) | Case No. 1:04-CV-2476 |
| Plaintiff, ) | |
| ) | Judge Ann Aldrich |
| v. ) | |
| ) | |
| VETERANS ADMINISTRATION MEDICAL ) | |
| CENTER, ) | |
| ) | MEMORANDUM AND ORDER |
| Defendant. ) | |
| ) | |

Before the court is defendant Veterans Administration Medical Center's ("VAMC") motion for summary judgment [Doc. 33], plaintiff Deon Colvin's ("Colvin") brief in opposition [Doc. 35], and VAMC's reply [Doc. 37].

For the following reasons, the court grants VAMC's motion for summary judgment.

**I.    BACKGROUND**

Colvin filed a five-count complaint against the VAMC for breach of implied contract, intentional infliction of emotional distress, promissary estoppel, race discrimination in violation of Title VII of the Civil Rights Act of 1964, and race discrimination in violation of Ohio Revised Code. [Doc. 10].

On June 2, 2002, Colvin, an African-American male, began work as a staff pharmacist at the VAMC's Wade Park Medical Facility in Cleveland, Ohio. For the first seven weeks of employment, Colvin received the standard orientation program for staff pharmacists. Colvin's "first-line supervisor" was Henry Armbruster.

Following the orientation program, Colvin was placed on the midnight shift, where he was the only pharmacist on duty. Colvin states that he was "ill prepared to work the night shift by himself because he had little experience working in a hospital environment where many of the practices, procedures and medicines were different from that which he was used to dispensing at a pharmacy in a retail environment." [Decl. of Colvin, Doc. 35-2, ¶ 7]. During the first few weeks on the midnight shift, Colvin "made a few mistakes," including dispensing *ten boxes* of syringes of injectable morphine, where the order called for *ten syringes* of injectable morphine. [Docs. 35; 33-3]. The second mistake identified by Armbruster occurred when Colvin "finished and verified" an insulin prescription without including important information "in the special instructions portion of the pharmacy form."  [Doc. 33-3]. The third mistake occurred when Colvin "failed to find and correct an error in a physician's order" for heparin. *Id*. Finally, Armbruster states that Colvin did not process orders fast enough and that his performance did not improve over time. *Id*.

As a result of these mistakes, Colvin received two "unacceptable" ratings on his performance evaluation and was terminated from his employment at the VAMC on May 28, 2003, shortly before the expiration of his probationary period.

Following discovery, the VAMC filed a motion for summary judgment, arguing that Colvin failed to establish his prima facie case of discrimination and, in the alternative, that Colvin failed to show that the VAMC's reasons for his termination were pretextual.

**II.    LAW AND ANALYSIS**

**A.    Summary Judgment Standard**

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

-2-

movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986); *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004).  If the movant succeeds, the burden then shifts to the nonmoving party to demonstrate the existence of a material dispute as provided in Rule 56(e)(2):

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial. . . .

Fed. R. Civ. P. 56(e)(2); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).  Parties opposing summary judgment must go beyond the pleadings and produce some type of evidentiary material in support of their position.  *See Celotex,* 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, this Court must view all of the evidence in the light most favorable to the nonmoving party.  *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Hamby v. Neel*, 368 F.3d 549, 556 (6th Cir. 2004);  *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson,* 477 U.S. at 248.  An issue is "genuine" if the evidence is such that a reasonable juror "could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict" or whether the evidence is "so one-sided that [the moving party] must prevail as a matter of law."  *Id.* at 252.

**B.     The Legal Framework Under Title VII and McDonnell Douglas**

The framework for analyzing claims under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-17, and 42 U.S.C. § 1981) and Ohio Revised Code section 4112 was set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Carter v. Univ. of Toledo*, 349 F. 3d 269, 272 (6 th Cir. 2003) (citing *Ohio Civil Rights Comm'n v. Ingram*, 69 Ohio St. 3d 89, 630 N.E. 2d 669, 674 (1994)) (the federal and state discrimination claims may be analyzed together "because Ohio's requirements are the same as under federal law").  The framework first requires that the plaintiff establish a prima facie case.  *McDonnell Dougals*, 411 U.S. at 802; *see also Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006).  If the plaintiff establishes a prima facie case, the plaintiff is entitled to a presumption that the defendant discriminated against him or her in violation of Title VII and the burden of production shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse treatment.  *Id*. (citations omitted).  "If the defendant meets this burden, the presumption of discrimination falls away and the plaintiff then needs to show that the defendant's 'legitimate, nondiscriminatory reason' was 'pretext for discrimination.'" *Id*. at 706-07 (citations omitted).  Throughout this framework, the plaintiff bears the ultimate burden of proving, by a preponderance of the evidence, the intent of the defendant to discriminate.  *Id*. at 707; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

### C. Prima Facie Case

To establish a prima facie case, the plaintiff must allege and prove that: (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.  *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).

Here, it is undisputed that Colvin meets the first three elements: he is African-American; he was terminated; and he was qualified for the position he held.  Colvin contends that he was treated

-4-

less favorably than a similarly-situated, non-protected employee.  He identifies Lance Norris as a Caucasian man who began employment as a staff pharmacist at the same VAMC facility, at the same time, with the same supervisor, and subject to the same standards.  Colvin further asserts that both he and Norris had similar performance records, yet Colvin was terminated and Norris remained employed. [Doc. 35, at 10-15].  At all relevant times, both Colvin and Norris were within the probationary period for new employees.  The VAMC disputes that Norris is a similarly-situated comparator "because he did not engage in the same conduct as plaintiff." [Doc. 33-2, at 6].

       To be deemed "similarly-situated," the comparator employee "must have been subject to the same supervisor, . . . the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).  Plaintiff must show that the comparator's acts were of "comparable seriousness" to his or her own actions.  *Id*.  "The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (citations omitted) (emphasis original).  Thus, the court must undertake a case-specific analysis to determine if the identified comparator employee is similarly-situated to the plaintiff.  *Id*. (the court should "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the [comparator] employee.").  At the summary judgment stage, the court must view all evidence offered in the light most favorable to the nonmoving party.

Here, Colvin has identified Norris as comparator employee. Colvin and Norris, while similar in many respects, are not similar in all relevant respects because their errors are not of comparable seriousness. The VAMC relies on the declaration of Armbruster to demonstrate that Colvin and Norris are not similarly-situated. [Docs. 33-2, at 6-7; 33-3]. The VAMC's position is that:

> Due to plaintiff's mistakes in filling prescriptions and his lack of speed when filling prescriptions, among other factors, Plaintiff received unsuccessful ratings on two of his performance standards. Although Mr. Norris did make some errors during his probationary period, Mr. Norris's errors were not as egregious or numerous as Plaintiffs, and Mr. Norris received successful ratings on all of his performance standards (Armbruster Dec., ¶ 17.) Mr. Norris's successful performance review certainly would be a distinguishing factor that would distinguish the VAMC's treatment of him from its treatment of Plaintiff.

[Doc. 33-2, at 6-7].

Specifically, the VAMC, through the declaration of Armbruster [Doc. 33-3] and email communications [Docs. 33-4; 33-5; 33-6], identifies three instances of "significant error," which all occurred within the first two weeks of August 2002, shortly after Colvin began working the midnight shift. First, Colvin improperly filed a morphine order for ten syringes for the urgent care unit when he sent the unit ten boxes of syringes. Morphine is a controlled substance and must be accurately accounted for; the boxes were subsequently returned to the pharmacy. [Doc. 33-4]. Next, Colvin failed to place special instructions on the pharmacy form for an insulin prescription and was notified of the error via email. [Doc. 33-5]. Finally, Colvin failed to find and correct an error in a physician's order for heparin. [Doc. 33-6]. Armbruster also notes that, on at least one instance, it took Colvin three and a half hours to complete an order that should have taken no more than one hour to complete. As a result of these documented errors, Colvin received two "unacceptable" ratings on his May 23, 2003 "performance appraisal;" consequently, Covlin's employment at the VAMC was terminated on May 28, 2003. [Doc. 33-8].

By comparison, Norris was seen has having "similar problems" as Colvin with respect to timeliness by at least two of his co-workers. The declaration Annette Douglas, a pharmacy technician with Colvin and Norris, states that Norris had "similar problems keeping up with the workload as Mr. Colvin" and that Norris "was often behind in processing orders and in preparing intravenous medications for delivery to the wards." [Doc. 35-6]. Similarly, the declaration of Angela Brazile, a nurse manager at the VAMC, stated that she "and other nurses had similar problems with Mr. Norris as we had with Mr. Colvin." [Doc. 35-7] Brazile continued, "[f]or example, it would take 3-4 hours or sometimes longer to get our medications and the phone would ring too long before anyone answered." *Id.* In addition, Armbruster's own staff meeting minutes from December 18, 2002, indicated his thoughts on the slow processing speed in the pharmacy at the time: "I believe that a number of factors combined to make our processing times slower than usual: Lance [Norris] filling in for Debby and not having an established night shift routine . . . ." [Doc. 35-8]. While the issue of processing speed was addressed in December of 2002, months after Colvin was removed from the day shift and placed on the midnight shift, Armbruster's comments shed insight into the working environment. Colvin's slow processing time, as described in Armburster's declaration, occurred within the first few weeks of Colvin's work on the midnight shift; Norris had similar slow processing times when he was placed on the midnight shift. Taken in the light most favorable to Covlin, both he and Norris appear to have similar records with regard to timeliness.

Next, Colvin's failure to find and correct an error in a physician's order for heparin is more properly viewed in the context of over-all interventions. An intervention "is when a pharmacist believes a mistake or omission has been made by a physician in an order and which results in a change including any additions or deletions in that order." [Covlin Dec., Doc. 35-2, ¶ 16].

-7-

According to the Performance Standards at VAMC, each pharmacist "will perform certain clinical functions," which include "[d]ocumenting interventions on Pharmacist Intervention Log forms." [Doc. 35-4]. The VAMC's records indicate that during the first five months of 2003, Colvin logged 27 interventions and Norris logged one. While numerous factors could account for the number of interventions each pharmacist performs (e.g., whether interventions are actually or accurately logged; the competency of physicians - or the quality of their handwriting - working at the same time as the pharmacist), the evidence taken in the light most favorable to Covlin suggests that he is similar to, or perhaps better than, Norris with respect to interventions and preventing physician error.

Colvin also performed more favorably than Norris in terms of inspections of medication storage. Again, according to the Performance Standards at VAMC, each pharmacist must perform certain "critical" administrative functions, including "[p]erforming monthly inspections of medication storage as assigned." [Doc. 35-4]. In an email from Armbruster on May 10, 2004, he notes that Colvin "completed all his inspection of ward 31 as required" but "failed to complete his inspections of the cardiac cath lab for five months." [Doc. 35-9]. In comparison, Norris "failed to complete his assigned inspections for all twelve months in question," which resulted in "written counseling" after he failed to correct the failure. [Doc. 35-9].

Additionally, Colvin performed more favorably than Norris in the area of counseling. According to the Performance Standards at VAMC, each pharmacist must perform certain clinical functions, including "[c]ounseling inpatients on appropriate medication use and documenting this counseling in the patient's computerized record." [Doc. 35-4]. The VAMC records show that Colvin had counseled substantially more patients than Norris during the first five months of 2003. [Doc. 35-13]. Thus, the record reflects that for at least two criterion of the Clinical Activities section of the

-8-

Performance Standards review, Colvin demonstrably performed better than Norris, yet Armbruster rated his performance as "unacceptable."

Finally, Covlin filled nearly one thousand more prescriptions over a five month period than did Norris. In his affidavit, Colvin claims that because "most staff pharmacists are assigned to various areas of the pharmacy on a rotating basis . . . the number of prescriptions filled by each pharmacist should be more or less equal especially over a five month period." [Doc. 35-2].

However, as the VAMC argues, a pharmacist is a "professional whose performance cannot be measured solely by statistics." Despite the similarities listed above, Colvin and Norris do not share errors of *comparable seriousness* when filling prescriptions. Colvin filled a prescription for ten syringes of morphine by releasing ten boxes of syringes of morphine (one hundred syringes). Because morphine is a controlled substance, Colvin's supervisor viewed this error as a "significant mistake." [Doc. 33-3]. Similarly, Colvin "finished and verified an insulin prescription incorrectly" when he failed to include relevant information in the special instructions form. [Doc. 33-3]. This error was also considered "significant" by his supervisor. [Doc. 33-3]. These errors create the "differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F. 2d at 583.

Colvin has been unable to show, and therefore unable to carry his burden, that Norris committed errors of comparable seriousness when filling prescriptions. The declarations of Annette Douglas and Angela Brazile, provided by Colvin, state that Norris was similar to Colvin only with regard to their processing speed.[1] [Docs. 35-6; 35-7]. While Covlin's specific errors, as identified by

---

[1] *Cf. Conley v. U.S. Bank Nat. Ass'n*, 211 Fed.Appx. 402, 408 (6th Cir. 2006) (noting that "when assessing work performance, it 'is the perception of the decision maker [that] is relevant, not the self-assessment of the plaintiff'" (quoting *Hawking v. PepsiCo. Inc.*, 203 F.3d 274, 280 (4th Cir. 2000))).

Armbruster, occurred within the first weeks of his duty on the midnight shift and are therefore more expected or understandable, it is not for this court to second guess or micro-manage the process used by employers in making their determinations as to the acceptability of employees' job performance.

Admittedly, the determination as to whether Colvin and Norris are similarly-situated is a difficult one. By the numbers, Colvin performed more favorably under certain criteria. Yet, Norris lacked the "significant errors" in his record that Colvin committed early in his employment for the VAMC. Therefore, the court cannot find that Colvin is similarly-situated to Norris. Accordingly, Colvin cannot establish his prima facie case of discrimination.

### III. CONCLUSION

Colvin has failed to establish his prima facie case. Accordingly, the VAMC's motion for summary judgment [Doc. 33] is granted.

IT IS SO ORDERED.

                                              s/Ann Aldrich
                                              ANN ALDRICH
                                              UNITED STATES DISTRICT JUDGE

**Dated: October 14, 2008**